DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Elliot Moskowitz
Daniel J. Schwartz
Marc J. Tobak

*Counsel to Plaintiff Digital Currency Group, Inc.*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Genesis Global Holdco, LLC, et al.,<br><br>Debtors.[1] | **Case No. 23-10063 (SHL)** |
| DIGITAL CURRENCY GROUP, INC.,<br><br>Plaintiff,<br><br>- against -<br><br>VINCENT FALCO, STEPHEN H. SOKOLOWSKI, AND CHRISTOPHER H. SOKOLOWSKI<br><br>Defendants. | **Adversary Pro. No. _____** |

## COMPLAINT

Digital Currency Group, Inc. ("**DCG**"), Plaintiff in the above-captioned adversary proceeding, alleges as follows on knowledge as to itself, and on information and belief as to all other matters:

---

[1] The Wind-Down Debtors in these cases, along with the last four digits of each Wind-Down Debtor's registration number in the applicable jurisdiction, are as follows: Genesis Global Holdco, LLC (8219), Genesis Global Capital, LLC (8564), and Genesis Asia Pacific Pte. Ltd. (2164R).

**NATURE OF THE ACTION**

1.  DCG brings this adversary proceeding pursuant to Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and section 105(a) of the United States Bankruptcy Code (the " **Bankruptcy Code**") to enjoin defendants in this adversary proceeding Vincent Falco, Stephen H. Sokolowski and Christopher H. Sokolowski (collectively the "**Creditor Defendants**") from the continued litigation of the causes of action asserted in (i) the amended complaint filed on March 25, 2025 [ECF No. 22] (the "**Sokolowski Complaint**") in the action captioned *Sokolowski v. Digital Currency Group, Inc.*, No. 4:25-cv-00001-PJC (M.D. Pa. 2025); (ii) the complaint filed on May 30, 2025 [ECF No. 1] (the "**Connecticut Complaint**" and, together with the Sokolowski Complaint, the "**Sokolowski Complaints**") in the action captioned *Sokolowski v. Digital Currency Group, Inc.*, No. 3:25-cv-00870 (D. Conn. 2025); and (iii) the complaint filed on May 6, 2025 [ECF No. 1] (the "**Falco Complaint**" and, together with the Sokolowski Complaints, the "**Creditor Complaints**") in the action captioned *Falco v. Digital Currency Group, Inc.*, No. 1:25-cv-03771-DLC (S.D.N.Y. 2025).

2.  The confirmed plan of reorganization (the "**Plan**") and this Court's Confirmation Order (the "**Confirmation Order**")—and governing law—give the Debtors the exclusive right to prosecute estate causes of action. The Debtors have already exercised this exclusive authority: they have filed two complaints against DCG and certain of its officers and principals. The individual Creditor Defendants have also sued DCG—hoping to recover from DCG the unpaid balance of their claims against Genesis, and to do so based on allegations identical in substance to those made by the Debtors. Those claims are, therefore, derivative claims that belong exclusively to the Debtors.

3.  The Creditor Defendants' complaints leave no doubt that the Creditor Defendants are pursuing estate claims exclusively vested in the Debtors. Their complaints contend that DCG

2

is liable for the unrecovered amounts of their claims against Genesis because DCG's alleged mismanagement led to Genesis's downfall, or because DCG allegedly joined with Genesis to harm Genesis customers as a group. These are textbook examples of derivative claims that are property of the estates.

4. Comparison of the Creditor Complaints and the Debtors' complaints eliminates any doubt: The Creditor Defendants' complaints are premised on the same alleged facts as those of the Debtors, and all of the complaints seek redress for the same alleged injury to Genesis creditors.

5. By prosecuting claims that the Plan vests in the Debtors, and by doing so for their sole benefit, unconstrained by the oversight mechanisms established under the Plan, or the fiduciary duties to all similarly situated creditors that the Plan imposes, the Creditor Defendants have subjected the distribution of estate property to the jurisdiction of other courts and are frustrating administration of the estates pursuant to the confirmed Plan.

6. If not enjoined, the Creditor Defendants' suits will result in a race between the Creditor Defendants and the hundreds of similarly situated creditors whose interests are represented in the parallel litigation brought by the Debtors. Other creditors of Genesis may well decide to launch their own suits, increasing the number of actions competing with the estates.

7. Section 105(a) of the Bankruptcy Code empowers this Court to enjoin the pursuit of suits that threaten the administration of the Debtors' estates and that impair this Court's jurisdiction over the Debtors' assets. This Court should, respectfully, exercise that power to enjoin the Creditor Defendants from continuing to interfere with this Court's jurisdiction over estate property, and the confirmed Plan's provisions for administration of that property.

## THE PARTIES

8.  DCG is a holding company that is the ultimate corporate parent of Genesis. Genesis Global Holdco, LLC ("**Holdco**") and certain of its affiliates (collectively, "**Genesis**" or the "**Debtors**") were entities involved in digital assets financial services that entered chapter 11 bankruptcy on January 19, 2023.

9.  Stephen H. Sokolowski and Christopher H. Sokolowski (the "**Sokolowskis**") are brothers who, through their wholly owned LLC investment fund, Cryptocurrency Management LLC ("**CM**"), loaned cryptocurrencies to Genesis.

10. The Sokolowskis, through CM, were general unsecured creditors of the Debtors and resolved their claims against the Debtors in a transfer to Jefferies Leveraged Credit Products, LLC on January 31, 2023. They allege they collectively received $742,142.73 in connection with that sale.

11. Vincent Falco ("**Falco**") is an individual who loaned cryptocurrencies to Genesis and is a general unsecured creditor of the Debtors.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b), 28 U.S.C. §§ 157(a)-(b), and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, dated January 31, 2012.

13. The Court has "arising in" jurisdiction over this adversary proceeding because it requires the Court to "interpret and enforce" its order confirming the Debtors' Plan. *In re Motors Liquidation Co.*, 829 F.3d 135, 153 (2d Cir. 2016).

14. The Court also has "related to" jurisdiction over this adversary proceeding, and jurisdiction to enjoin the Creditor Defendants because the Creditor Defendants' actions, unless

4

stayed, "could conceivably have any effect on the estate being administered in bankruptcy." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995); *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 339 (2d Cir. 2018). DCG seeks to enjoin the Creditor Defendants from prosecuting actions that are derivative of estate causes of action, and, if prosecuted, threaten this Court's jurisdiction over the *res* and its administration of the estates.

15. This Court's exercise of jurisdiction is also consistent with the Debtors' Plan, which provides that the Court retains jurisdiction "over all matters arising in and under, and related to, the Chapter 11 Cases." (Plan at IX.7, 9, 11, 12.)

16. Venue is proper pursuant to 28 U.S.C. § 1409.

## FACTUAL ALLEGATIONS

**The Debtors' Bankruptcy Proceedings**

17. Prior to their chapter 11 filing, the Debtors were involved in cryptocurrency-related financial services, including: (i) facilitating spot trading in digital assets; (ii) digital asset lending and borrowing services in consideration for the payment of interest; (iii) derivatives services; and (iv) custodial services for customers to securely store digital assets. Genesis Global Holdco, LLC ("**Holdco**") was a holding company for Genesis Global Capital, LLC ("**Genesis**") and Genesis Asia Pacific PTE. Ltd. ("**GAP**").

18. In May of 2022, the digital assets market was severely disrupted after two cryptocurrencies—LUNA and TerraUSD—collapsed. Soon thereafter, digital asset hedge fund Three Arrows Capital Ltd. ("**3AC**") was unable to meet its creditors' margin calls and commenced liquidation proceedings. The Debtors had extended various loans to 3AC since 2020, which loans amounted to approximately $2.4 billion in cash and digital assets. The Debtors were only able to foreclose on approximately $1.2 billion of the outstanding obligations,

5

leaving $1.1 billion remaining payable in connection with the 3AC lending relationship. On June 30, 2022, DCG assumed the remainder of GAP's loans with 3AC, and entered into a $1.1 billion promissory note in favor of GGC that had a 10-year maturity and fixed interest rate of 1% that could, at DCG's option, be paid in kind, thereby assuming and replacing GAP's intercompany loan payable to GGC.

19. Meanwhile, market decline spread to other crypto-associated companies: in July 2022, both Celsius Network LLC and certain affiliates and Voyager Digital Holdings, Inc. and certain affiliates filed for bankruptcy. Mere months later, FTX Trading Ltd. ("**FTX**") and, Alameda Research Ltd. ("**Alameda**") filed for Chapter 11 bankruptcy on November 11, 2022, creating unprecedented and widespread market contagion in the crypto industry. This period has since been dubbed the "crypto winter."

20. In response to these "drastic market shifts," Genesis experienced unprecedented withdrawals. As the FTX entities began to collapse, the Debtors received calls on their loans amounting to approximately $827 million—essentially, a 'bank run.' Unable to meet the unprecedented volume and size of the loan calls, the Debtors paused all lending and borrowing on November 16, 2022. The Debtors filed for chapter 11 bankruptcy on January 19, 2023.

**The Confirmed Genesis Plan Authorizes the Debtors to Pursue Claims Against DCG**

21. The Debtors' Plan and Disclosure Statement make clear that pursuit of estate claims against DCG is a centerpiece of the Debtors' Plan and a "key component[]" of the Plan consideration provided to Genesis customer creditors.

22. The Debtors' Plan and Disclosure Statement make clear that pursuit of estate claims against DCG is a centerpiece of the confirmed Plan.

23. As explained in the Debtors' Amended Disclosure Statement [ECF No. 1031] (the "**Disclosure Statement**"), "the most valuable Distributable Assets are the estates' claims against

6

the DCG Parties." Consequently, the Disclosure Statement highlights that a "key component[]"of the Plan consideration provided to Genesis creditors is the value of such claims: the Disclosure Statement describes the distribution to Holders of Allowed General Unsecured Claims as including ". . . certain Avoidance Recoveries (including proceeds from any and all Causes of Action or other claims against any of the DCG Parties)[.]" To ensure that no creditor failed to understand the risk that this posed, the Disclosure Statement cautions that "[a]ny litigation against the DCG Parties would involve significant time and expense for an uncertain outcome . . . Distributions to creditors could be significantly delayed pending the results of litigation, and would not be available to the extent that the [Debtors] were not successful in litigation." Consistent with the Debtors' view that claims against DCG represent a significant form of value for the benefit of Genesis's creditors, the Disclosure Statement sets forth, at length, the results of the "Special Committee Investigation" into the Debtors' purported claims against DCG.

24. The Plan therefore provides that the Debtors retain the exclusive right to prosecute causes of action against DCG. Provisions to preserve and prosecute these causes of action are woven throughout the confirmed Plan. For example:

- The Plan provides for "Retained Causes of Action," which are defined as causes of action "that belong to the Debtors or their Estates . . . which shall include . . . all such Causes of Action or other claims against . . . any of the DCG Parties."

- The Plan vests the Retained Causes of Action in the Debtors, which may "exclusively enforce any and all such Causes of Action".

- The Plan reserves to the Debtor "the exclusive right, authority, and, at the direction of the Litigation Oversight Committee, ability to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action."

- The Plan creates the office of "PA Officer," a person charged with "enforcing Retained Causes of Action."

7

- The Plan creates a Litigation Oversight Committee to review and advise the PA Officer on "strategy and pursuit of the Retained Causes of Action."

- The Plan imposes on both the PA Officer and Litigation Oversight Committee fiduciary duties owed to "all Holders of Claims and Interests that are entitled to receive distributions pursuant to the Plan," and charges them with pursing the Debtors' causes of action consistent with their duties to creditors.

- The Plan Supplement [ECF No. 1117] (the "**Plan Supplement**") emphasizes that the Debtors "expressly reserve all Causes of Action that may be brought by or on behalf of the Debtors [and] their Estates . . . against any DCG Party (including DCG and Barry Silbert) . . . including claims for alter ego, preference, fraudulent conveyance, breach of fiduciary duty, equitable subordination, recharacterization, and improper setoff, breach of contract, and claims sounding in fraud or aiding and abetting fraud."

25. This Court confirmed the Debtors' Plan on July 21, 2024, [ECF No. 1736].

26. The Confirmation Order's decrees provide that only the Debtors may pursue estate causes of action. Paragraphs 40 and 116-118 of the Confirmation Order state that "the Debtors shall retain, and may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action belonging to the Debtors or their Estates . . . including any Retained Causes of Action," while Paragraph 118 further provides that the right to pursue those causes of action is "exclusively" vested in the Debtor.

27. Having vested the Debtors with exclusive authority to prosecute estate Causes of Action, the Court further ordered that it retained jurisdiction to administer and enforce the Plan and Confirmation Order. This Court thus retains jurisdiction to:

- "adjudicate, decide, or resolve any and all matters related to Causes of Action by or against a Debtor";

- "enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan";

- "resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan";

- "issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan."

**The Debtors Exercise their Exclusive Right to Prosecute Estate Claims Against DCG**

28. In May 2025, the Debtors exercised their exclusive right to prosecute claims against DCG, and against individual defendants including Barry Silbert and Soichiro "Michael" Moro. *See* Notice of Removal, *Genesis Global HoldCo, LLC v. Digital Currency Grp., Inc.*, No. 25-cv-733 (D. Del. June 12, 2025) (the "**Delaware Complaint**") [ECF No. 1-1]; Complaint, *Genesis Global Capital, LLC v. Digital Currency Grp., Inc. (In re Genesis Global HoldCo, LLC)*, Adv. Pro. No. 25-01097 (Bankr. S.D.N.Y. May 19, 2025) [ECF No. 1] (the "**Adversary Proceeding**" and, together with the Delaware Suit, the "**Debtor Complaints**").

29. The Delaware Complaint asserts a number of claims seeking to hold DCG and individual defendants liable for alleged breaches of duties owed to Genesis and its customer-creditors. The Debtors assert claims for breaches of fiduciary duties to Genesis, aiding and abetting breaches of fiduciary duties, operating Genesis as the "alter ego and instrumentality" of DCG, and for unjust enrichment. The Debtors also bring claims against DCG in their capacity as the assignee of Gemini Trust Co.'s claims for fraud and negligent misrepresentation.[2]

30. In the Adversary Proceeding, the Debtors seek to claw back certain transfers allegedly made to DCG as avoidable fraudulent or preferential transfers. The Debtors allege that DCG was an insider at Genesis and therefore "knew through [its] close relationship with Genesis that its business was on the brink of collapse, and that certain transfers from Genesis to DCG were made while Genesis was insolvent.

---

[2] The Debtors assert their eighth cause of action—alter ego—both as Genesis Debtors and as assignees of Gemini's claims. (Del. Compl. ¶ 336.)

31. Taken together, the Debtor Complaints assert that DCG and the individual defendants are liable for facilitating Genesis's alleged misconduct, for being an alter ego of Genesis, and/or for obtaining for themselves value that should have gone to Genesis's creditors.

**The Creditor Defendants Commence Suits Asserting Estate Causes of Action**

32. Long after confirmation of the Plan and entry of the Confirmation Order vesting the Debtors with the "exclusive right" to pursue estate causes of action, the Creditor Defendants commenced their own actions against DCG and individual defendants.

33. Each of these actions, in the Creditor Defendants' own words, seeks to hold DCG liable for the amounts of the Creditor Defendants' claims against Genesis that they have not yet recovered through the bankruptcy. And in each of these actions, it is clear that the Creditor Defendants hope to hold DCG and individual defendants liable for injuries to Genesis or Genesis creditors at large, not for any conduct specifically directed to the Creditor Defendants.

34. Falco, who sued DCG and two individual defendants, Messrs. Silbert and Moro, contends that he was "fraudulently induced into loaning a substantial amount of bitcoin to a company that was in its death throes"—i.e., Genesis. Falco asserts that he relied on various false representations that Genesis and Genesis personnel made to him—for example, he alleges a "Genesis Global representative" presented Falco with a lending report that included "false" figures and that "Genesis Global sent . . . individual investors like Falco[] reports falsely describing Genesis Global's financial condition." Falco seeks to hold DCG and the individual defendants liable for these misrepresentations by Genesis because, he contends, they were "mere alter egos of Genesis Global," or because they "caused" or "orchestrated" these false statements by Genesis.

35. Falco does not allege that he had any direct communication with DCG or any of the individual defendants in his action. In connection with his allegations, Falco asserts causes

10

of action for common law fraud; aiding and abetting fraud; conspiracy to commit fraud, New York tortious interference with contract; violation of New York Business Law § 349; violation of California consumer protection and unfair competition laws; and violation of Connecticut unfair trade practices law.

36.     The Sokolowski Complaints are "identical" and also name DCG, Mr. Silbert and Mr. Moro.  The Sokolowskis claim that "a Genesis employee" showed the Sokolowskis a "fraudulent balance sheet," and that "relying on the deceptive balance sheet provided to them and the overall impression that Genesis's service was safe and well-capitalized," they caused their investment fund, CM, to continue to lend assets to Genesis.  Like Falco, the Sokolowskis allege that "Genesis routinely communicated with its clients, including Plaintiff," and that CM relied on a "deceptive balance sheet" provided to them by "a Genesis employee," which purportedly listed the promissory note entered into between DCG and Genesis as a "current asset."  The Sokolowskis posit that DCG should be held liable for Genesis' alleged misrepresentations because DCG "orchestrated," "approved" and had "control" over Genesis and its communications with customers– including, by way of example, its preparation for Genesis of "Genesis Source of Strength Talking Points" that allegedly were designed to "present a misleading narrative of stability."  In connection with these allegations, the Sokolowskis assert one cause of action for violation of Pennsylvania's consumer protection law in the Pennsylvania action and claims for violation of Connecticut's unfair trade practices law; fraud; negligent misrepresentation; conspiracy; aiding and abetting fraud; and unjust enrichment in the Connecticut action.

37.     The Sokolowskis and Falco seek to recover on claims that are properly assertable exclusively by the Debtors, and that the Debtors have already asserted.  They seek to recover for

11

generalized injuries to all customers of Genesis—or all Genesis creditors as a whole—and, conversely, fail to allege that they suffered any particularized harm that DCG caused directly, as opposed to through Genesis. They also seek to recover based on alleged misconduct directed to Genesis, premised on the exact same facts alleged in the Debtors' complaints.

38. The core allegations in the Creditor Complaints bear out that what the Creditor Defendants seek is to hold DCG liable for allegedly mismanaging Genesis, or working with Genesis to cause the injuries the Creditor Defendants aver they suffered.

39. In overview, the Creditor Complaints allege:

- Genesis was the alter ego of and controlled by DCG.

- DCG caused Genesis to engage in deficient risk management practices, be overconcentrated in the cryptocurrency market, and operate with insufficient liquidity.

- When cryptocurrency prices declined, Genesis faced outsize exposure to the risk of a counterparty default, which materialized when cryptocurrency hedge fund 3AC failed to meet a margin call the Debtors placed on an outstanding $2.36 billion obligation.

- Genesis was left with a balance sheet 'hole' after the 3AC failure, which DCG filled by issuing a promissory note of $1.1 billion to Genesis Capital.

- At the direction of DCG, Genesis used its misleadingly repaired balance sheet to offer "false assurances" and disseminate misinformation regarding Genesis' financial health.

- In reality, Genesis was effectively insolvent, and when it could no longer meet its customers' loan calls, it filed for bankruptcy.

40. That the Creditor Defendants seek to recover for harms done to or through Genesis to the creditor body as a whole is amply illustrated by the Falco Complaint and Connecticut Complaint, which assert claims for aiding and abetting Genesis's fraud, for conspiring with Genesis to harm customers, or for causing Genesis to make false representations to customers. All of this conduct, the Creditor Defendants allege, did not injure them

particularly or individually—in Falco's own words, this alleged conduct injured "thousands of investors" similarly situated.

41. The Creditor Complaints do not allege that DCG acted in a manner directed to a Creditor Defendant; DCG is only alleged to have acted <u>through</u> Genesis, by allegedly crafting, causing, or otherwise facilitating the allegedly false or misleading statements that <u>Genesis</u> made to the Creditor Defendants. Neither the Falco nor the Sokolowski Complaints alleges a <u>single communication</u> directly between DCG and the Creditor Defendants.

42. The Creditor Complaints—at most—allege that DCG injured the Creditor Defendants by acting <u>through</u> Genesis in a manner directed to Genesis customers as a whole.

43. Falco and the Sokolowskis both state that they seek to recover against DCG on the amount on their claims against the Debtors that has not been paid through the bankruptcy claims process. The Falco Suit explains that "[b]ecause the Genesis Global estate has not recovered nearly enough to make Falco whole, Falco is still out a significant amount of the bitcoin he loaned to Genesis Global, and he seeks to recover the bitcoin the Defendants fraudulently took from him." Similarly, the Sokolowskis explain that they seek to recover from DCG "the identical number and type(s) of cryptocurrency coins that Plaintiffs originally entrusted to Genesis, subject to an appropriate offset for the partial bankruptcy claim sale proceeds Plaintiffs have received."

44. The Creditor Complaints are also predicated on identical facts to the estate causes of action pursued by the Debtors. These include that DCG controlled and orchestrated Genesis' alleged misrepresentations to the public through the preparation of talking points for Genesis employees to use when speaking with customers, by drafting posts to be disseminated on Twitter, and by making financial decisions for Genesis, including decisions regarding

13

classification of assets on Genesis' balance sheet. Both the Creditor Complaints and the Debtor Complaints allege that Genesis was essentially a puppet or alter ego of DCG.

45. The near-perfect overlap between the facts underlying the Debtors' claims and the claims that the Creditor Defendants attempt to plead demonstrates that the Creditor Complaints assert derivative claims based on conduct directed to Genesis, not the Creditor Defendants.

46. Unless enjoined, the continued prosecution of the causes of action asserted in the Creditor Complaints threatens to interfere with this Court's jurisdiction over the Debtors' assets, and threatens to imperil the orderly administration of the estates.

## CAUSE OF ACTION

### COUNT I
**Preliminary Injunction Staying the Creditor Complaints Against DCG**

47. DCG repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein and the legal arguments advanced in the Memorandum of Law filed contemporaneously herewith, which is incorporated by reference.

48. DCG seeks to preliminarily enjoin the Creditor Defendants from the continued litigation of the causes of action asserted in (i) the Sokolowski Complaint in the action captioned *Sokolowski v. Digital Currency Group, Inc.*, No. 4:25-cv-00001-PJC (M.D. Pa. 2025); (ii) the Connecticut Complaint in the action captioned in the action captioned *Sokolowski v. Digital Currency Group, Inc.*, No. 3:25-cv-00870 (D. Conn. 2025); and (iii) the Falco Complaint in the action captioned *Falco v. Digital Currency Group, Inc.*, No. 1:25-cv-03771-DLC (S.D.N.Y. 2025), which are estate claims and exclusively assertable by the Debtors.

49. Section 105(a) authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C.

14

§ 105(a). It is well settled that the Court, under section 105(a), may enjoin suits that interfere with the Court's jurisdiction over and administration of the estates' assets.

50. In assessing whether such a preliminary injunction under section 105(a) is appropriate, courts look to the traditional requirements for a preliminary injunction under Federal Rule of Civil Procedure 65, modified to fit the bankruptcy context: (1) whether there is reasonable likelihood of success on the merits; (2) whether there is imminent irreparable harm to the administration of the estates or the Court's jurisdiction in the absence of an injunction; (3) whether the balance of the equities and public interest weigh in favor of an injunction.

51. DCG is likely to succeed on its claim that the Creditor Complaints seek to prosecute estate causes of action. The Creditor Complaints arise out of the same facts as the Debtor Complaints, seek to hold DCG liable for generalized harm to Genesis and its creditors, and hope to recover from DCG the unpaid amounts of the Creditor Defendants' claims against the Debtors' estates. These are textbook examples of derivative claims, and as set forth more fully in the Memorandum, the first prong of the preliminary injunction standard is satisfied.

52. Absent the requested injunction, the Creditor Complaints threaten to interfere with the orderly administration of the Debtors' estates and Plan and undermine this Court's exclusive jurisdiction over the Debtors' property. If the Creditor Defendants were to succeed, proceeds of estate claims would be distributed solely to the Creditor Defendants pursuant to the orders of the courts in which those claims are pending, rather than pursuant to the Plan. The Creditor Defendants would also obtain the full amount of any such recoveries, which might well exceed their equitable and ratable share of recoveries as provided by the Bankruptcy Code and the confirmed Plan.

53. The Creditor Defendants' interference with the Court's jurisdiction is not a mere potentiality. It is a fact. The Plan and Confirmation Order unambiguously provide that the Debtors have exclusive authority to prosecute estate causes of action under the supervision of the PA Officer and the Litigation Oversight Committee. And they impose fiduciary duties on the PA Officer and Litigation Oversight Committee to act in the interests of relevant holders of claims against the Debtors. By contrast, in prosecuting litigation that competes with the estates and that evades the Plan's reticulated oversight mechanism, the Creditor Defendants are impeding the full execution of the Plan and, therefore, the administration of the estates. The second prong of the preliminary injunction inquiry is comfortably met.

54. Enjoining the Creditor Defendants from pursuing estate claims is both consistent with the balance of equities and serves the public interest in the efficient and equitable conduct of bankruptcy proceedings. If not enjoined, the Creditor Defendant's suits will result in a situation where three claimants are permitted to race ahead of hundreds of similarly situated creditors by prosecuting estate claims in two actions that attempt to obtain priority of time and recovery <u>in competition with</u> the parallel litigation brought by the Debtors. Developments in those actions risk both undermining the claims brought by the Debtors or, alternatively, subjecting DCG to the unfairness of conflicting decisions in cases asserting congruent claims and seeking recovery for the same injuries. None of this is consistent with the confirmed Plan or basic bankruptcy principles. Nor would allowing the Creditor Defendants to pursue estate claims in competition with the Debtors advance, rather than impede, any meaningful public interests. The balance of equities and public interest heavily weigh in favor of the requested injunction.

55. An injunction staying the claims asserted in the Creditor Complaints is therefore appropriate.

56. DCG respectfully requests that the Court not require it to post any bond in connection with the relief requested herein, for the reasons stated here and in the Memorandum. Courts are vested with broad discretion to determine whether any bond is required as a condition to imposing a preliminary injunction. Here, no bond is necessary or appropriate because there is minimal risk that the Creditor Defendants will have been wrongfully enjoined and because the Creditor Defendants are unlikely to suffer any cognizable damages from a temporary injunction.

57. No prior application for the relief requested herein has been made to this Court or any other court.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully requests that this Court enter judgment in its favor and requests relief as follows:

(a) Enjoin the Creditor Defendants from pursuing the claims asserted in the Creditor Complaints.

(b) Waive any requirement that Plaintiff DCG provide security in connection with this proceeding.

(c) Any such other relief as the Court finds just and equitable.

Dated: July 8, 2025　　　　　　　　　　　　Respectfully submitted,
New York, New York

　　　　　　　　　　　　　　　　　　　　　*/s/ Benjamin S. Kaminetzky*
　　　　　　　　　　　　　　　　　　　　　Benjamin S. Kaminetzky

　　　　　　　　　　　　　　　　　　　　　Davis Polk & Wardwell LLP
　　　　　　　　　　　　　　　　　　　　　450 Lexington Avenue
　　　　　　　　　　　　　　　　　　　　　New York, New York 10017
　　　　　　　　　　　　　　　　　　　　　Telephone: (212) 450-4000
　　　　　　　　　　　　　　　　　　　　　Facsimile: (212) 701-5800
　　　　　　　　　　　　　　　　　　　　　Marshall S. Huebner
　　　　　　　　　　　　　　　　　　　　　Benjamin S. Kaminetzky
　　　　　　　　　　　　　　　　　　　　　Elliot Moskowitz
　　　　　　　　　　　　　　　　　　　　　Daniel J. Schwartz
　　　　　　　　　　　　　　　　　　　　　Marc J. Tobak

　　　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff Digital Currency Group, Inc.*